# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7472 | **DATE** | 3/7/2003 |
| **CASE TITLE** | Paul Pomozal, et al vs. City of Highland Park, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Defendants' motion for summary judgment [91-1] is granted in part and denied in part and Defendants' motion to strike is granted in part and denied in part [104-1]. The parties final pre-trial order is to be filed in open court on 3/24/03 at 2:00p.m. Trial is set to commence on 4/7/03 at 10:00a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | **Document Number** |
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | date docketed | | |
| 🖫 | Docketing to mail notices. | | G-N | | 12e |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 3/7/03 | | |
| | | | date mailed notice | | |
| TBK | courtroom deputy's initials | | | | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| PAUL POMOZAL, LAWRENCE WENG, BROCK KANE, and MARTIN STUMPF, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 00 C 7472 |
| CITY OF HIGHLAND PARK, DANIEL PIERCE, DAVID LIMARDI, DANIEL J. DAHLBERG, PETER BARRON, DANIEL BRUSSLAN, ROBERT GREENBAUM, and HERBERT KAMIN, | ) ) ) ) ) ) | Judge Ronald A. Guzman |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Pending is the Defendants' motion for summary judgment pursuant to FED.

R.CIV. P.56. Also pending is Defendant's motion to strike Plaintiff's 56.1 response. For

the reasons set forth below, both motion are granted in part and denied in part.

## BACKGROUND FACTS

Plaintiffs, Paul Pomozal ("Pomozal"), Lawrence Weng ("Weng"), Brock Kane

("Kane") and Martin Stumpf ("Stumpf") are current Highland Park police patrol officers.

Defendant City of Highland Park is an Illinois municipal corporation, Defendant Daniel

Pierce ("Pierce") is the Mayor of the City of Highland Park, Defendant David Limardi

(Limardi) is the Highland Park City Manger, Daniel J. Dahlberg ("Dahlberg") is the

current Chief of Police of Highland Park, Defendant Peter Barron (Barron) is the

Secretary of the Highland Park Civil Service Commission and Defendants Daniel

1



Brusslan, Robert Greenbaum and Herbert Kamin are members of the Highland Park Civil Service Commission.

On November 28, 2000, Plaintiffs filed their Initial Complaint, which sought a declaration of rights that a Media Policy passed by the Highland Park Police Department ("HPPD") was an unconstitutional abridgement of their right of free speech, freedom of association, and right to seek redress from their government. On the same day, in response to the Plaintiffs' Complaint, the HPPD rescinded the October Media Policy, and instituted a new Media Policy (the "November Media Policy"), which Defendants assert addressed the Plaintiffs' constitutional concerns. Plaintiffs deny that this revised November Media Policy redressed their constitutional concerns under the October Media Policy.

On April 17, 2001 Plaintiffs filed their First Amended Complaint. In Count I Plaintiffs allege that they have been deprived of their constitutional right to free speech and free association guaranteed under the First Amendment and the Equal Protection Clause under the Fourteenth Amendment by Defendants. In particular, Plaintiffs allege the following:

1) The Defendants have shown favoritism to patrol officers who are loyal to the Mayor, the City Manager, and the Chief of Police and his Command Staff, rather than loyal to their oaths to the community, by discriminating in promotions, job assignments, job training, and otherwise, against the Plaintiffs and other patrol officers who are loyal members of the patrol officers' union, and/or who complain of wrongdoing;

2) Defendant Dahlberg has participated in cheating, and the other Defendants have allowed cheating on promotional examinations and /or failed to punish, or remedy the same after it was brought to their attention. The Highland Park Civil Service Commission, including each individual Civil Service Member and Secretary named as a Defendant herein, "fixes" the oral examination scores to placate Dahlberg's undue influence upon them, which is exercised by his attending the Commission's deliberation.

2

The net effect of this process is to nullify the written examination results;

3) Regardless of capability, none of the Plaintiffs has, or has ever had, a fair chance at promotion, because of the Defendants' agreement to keep from advancement all Patrol Officers including the Plaintiffs, who are of suspect personal loyalty and/or are union advocates, and/or want to speak out against Police Department wrongdoing. The Defendants also successfully conspired to take the Lieutenant's promotional process effectively out of the hands of the Civil Service Commission, by creating the non-civil service rank of "Commander," in place of the Lieutenants' rank;

4) The Defendants have attempted to "bust" the patrol officers' union, of which the Plaintiffs are members, by engaging in unfair labor practices; and

5) On or about October 24, 2000, Highland Park promulgated a Media Relations Policy ("the October Media Policy"). The October Media Policy provides that "No employee shall communicate with representatives of any News Medium about City business except as authorized by the appropriate media relations officer."

Plaintiffs allege that despite Defendants' avowals of reform as evidenced by the revised Media policy, Defendants have continued their pattern of infringement upon Plaintiffs' First Amendment rights. This conduct Plaintiffs claim has had a chilling effect upon the Plaintiffs, and based upon the pattern of Defendants' conduct there is a substantial likelihood that the City of the Highland Park will impose another unconstitutional media policy if it is not prohibited from doing so.

Plaintiffs claim that they have sustained actual damages due to the infringement described upon their rights of free speech, free association, and right to seek redress of their grievances by reason of having to retain counsel to vindicate their rights, in attempting to overcome the civil service wrongdoing, to cause the October Media Policy to be replaced by the November Media Policy, and by the mental stress, unease, and humiliation attendant to the infringement.  Plaintiffs claim they are entitled to nominal and punitive damages by reason of the Defendants' violation of their free speech. Plaintiffs seek a money judgment order as well as an injunctive relief against Defendants

3

to deter Defendants from any further misconduct.

Count II of Plaintiffs' complaint alleges a violation of the Fourteenth Amendment under 42 U.S.C. § 1983. Plaintiffs claim that the Defendants have shown favoritism to patrol officers who are loyal to the Mayor, the City Manager, and the Chief of Police and his command staff, rather than loyal to their oath to the community. (Plaintiffs' Compl. Count II, par. 12). According to Plaintiffs Defendants have "fixed" promotional exam results for the 1991-2000 period as well have successfully conspired to take the Lieutenant's promotional process effectively out of the hands of the Civil Service Commission, by creating the rank of "Commander," which has the same pay and responsibilities as the post of Lieutenant, but is technically a Sergeant's post, thereby allowing appointment of de facto Lieutenants by the Chief of police, rather than de jure Lieutenants by the Civil Service Commission (Plaintiffs' Compl. Count II, par. 12). Plaintiffs further complain that Defendants have treated them unequally based upon their union membership (Plaintiffs' Compl. Count II par 13) as well as conspired to cover up the on-going corruption and favoritism in the HPPD (Plaintiffs' Compl. Count II, par. 14).

Plaintiffs claim they have sustained damages by reason of loss income associated with the unfair discrimination through the lack of promotions, job training, and otherwise stunted career growth (Plaintiffs' Compl. Count II, par. 16). Plaintiffs seek an injunction against Defendants for nullifying the promotional exam test results as well pay and benefits commensurate with proper advancement and training (Plaintiffs' Compl. Count II, par. 16). In addition, Plaintiffs seeks such other and further relief as is necessary to ensure that favoritism, discrimination, cheating on the promotional exams and the undue

4

influence exerted on the Civil Service Commission is ended. (Plaintiffs' Compl. Count II, par. 18).

### 1. Plaintiff Paul Pomozal

Pomozal joined the HPPD in January of 1980 and has always held the rank of patrolmen. (Defendants' 56.1 Statement ¶¶ 6 & 8). Pomozal is a member of the Teamster's Union, which represent the HPPD's patrol officers.(Defendants' 56.1 Statement ¶ 9).

Pomozal was informed by Sergeant Larson that the command staff kept a list of loyal and union backers, and was comprised of patrol officers "[w]ho could be counted on and who couldn't be counted on sort of thing." (Plaintiffs' 56.1 Response ¶13). Pomozal's name was on the list as a union backer and Pomozal took this as a negative comment by the command staff about himself. ( Id.). However, it is undisputed that neither Chief Dahlberg nor anyone else on the command staff of the HPPD has ever done anything or said anything to discourage Pomozal's attendance at a union meeting (Defendants' 56.1 Statement ¶11).

Pomozal took the Sergeant's promotional exam at the HPPD in 1987, 1989, 1991, 1993 and 1995 (Defendants' 56.1 Statement ¶15). Pomozal refrained from taking the exam in 1997 because Deputy Chief Benton told him if he was promoted, he would lose his position as a canine officer. (Plaintiffs' 56.1 Response¶ 15). Pomozal is very close to his dog and did not want this to happen. Pomozol claims that these circumstances were specifically formulated to prevent Pomozol from becoming a sergeant, and had kept him from seeking any further promotions. (Id.)

According to Pomozal Commander Schwartz was a canine officer who was

allowed to keep his dog after he was promoted to Commander (Id.). Pomozal believes that he was treated unfairly on the issues of his dog as well as all of the promotional exams. (Plaintiffs' 56.1 Response ¶16). During the 15 minute oral examination in 1989, Pomozal was asked about a then upcoming suspension that he had pending for telling a citizen at a traffic stop the he had recorded his conversation with the citizen, when in fact he had not recorded the conversation. (Defendants' 56.1 Statement ¶ 18). As of the 1991 promotional exam, Pomozal "was under the impression that...something was going on with the scoring with the orals...to manipulate the overall Sergeant's promotional exam scores. (Defendants' 56.1 Statement ¶ 22). Pomozal didn't really know what was going on until May of 2000, when the Sullivan Report, an independent investigation report, was completed and issued to Defendants. (Plaintiffs' 56.1 Response ¶ 22).

Pomozal has never written anything about the racial profiling which he alleges takes place within the HPPD. He has, however, spoken out about racial profiling at a sensitivity training session that was undertaken by the HPPD as part of Highland Park's consent decree with the American Civil Liberties Union. (Plaintiffs' 56.1 Response ¶27). Pomozal has also spoken out on issues of concern at union meetings. (Plaintiffs' 56.1 Response ¶ 28).

## 2. Lawrence Weng

Lawrence Weng joined the HPPD in 1984, left in 1988 and returned in 1989. (Defendants' 56.1 Statement ¶30). Weng is currently a patrol officer which was his rank when he joined the HPPD (Defendants' 56.1 Statement ¶ 31). Weng admits that there are no specialty positions which Weng ever wanted or applied for that he did not receive at the HPPD. (Defendants' 56.1 Statement ¶ 32). Weng complains, however, that the

HPPD does not have a system for requesting specialty assignments. (Plaintiffs' 56.1 Response ¶ 34).

Weng was a union steward in the mid-1990s (Defendants' 56.1 Statement ¶ 34) and promoted the initial unionization effort with the HPPD. (Plaintiffs' 56.1 ¶34). Defendant Dahlberg tried to intimidate Weng and other union representatives by threatening to take away overtime pay for patrolling the Ravinia Festival, and saying that the other officers would blame Weng and the other union representatives when this was done. (Id.). As to union issues Weng had made no complaints about the management of the Police Department within the past few years. (Defendants' 56.1 Statement ¶ 49 and Plaintiffs' Response).

Weng took the Sergeant's exam in 1990-91 and did not receive a passing score on the written portion of the exam. (Defendants' 56.1 Statement ¶ 35). During his career at the HPPD, Weng received only one letter of reprimand which he thought was unjustified. (Plaintiffs' 56.1 Statement ¶ 37). Weng does not believe that the letter has caused any adverse consequences to this career. (Id.). Weng believes that the cheating on the promotional exams at the HPPD has had adverse consequences to his career. (Plaintiffs' 56.1 Response ¶ 37).

When Weng was being trained as an officer by a fellow patrol officer, the officer committed racial profiling and encouraged Weng to do the same. (Defendants' 56.1 Statement ¶ 39). Over time Weng reduced his use of racial profiling to make stops but admits to having falsified reports to justify stops in the past. (Defendants' 56.1 Statement ¶ 39). By he time Weng left the HPPD Weng had stopped engaging in racial profiling. (Id.) Since returning to the Department in 1989, Weng has not engaged in any racial

profiling. (Id.). Weng admits that no member of the HPPD command staff has ever suggested to Weng that he should racially profile. (Defendants' 56.1 Statement ¶ 40). Weng has not personally observed racial profiling since his return to the Department in 1989. (Id).

In 1989 Weng made a trip to Washington DC, along with the Rev. Jesse Jackson and several other HPPD officers (Defendants' 56.1 ¶43). During the trip Weng attended a meeting with Bill Lan Lee of the Department of Justice regarding racial profiling in Highland Park. (Id.).

At the time Weng received the HPPD October Media Policy he had no future meetings scheduled with the press (Defendants' 56.1 Statement ¶ 44) but according to Weng there were discussions about the possibility of future meetings (Plaintiffs' 56.1 Response ¶ 44). Weng declined Tom Sullivan's request for an interview in connection with the independent investigation of the HPPD. (Defendants' 56.1 Statement ¶ 45). Weng has never written anything about racial profiling within the HPPD and Weng has never reported any incident of racial profiling to the department's command staff. (Defendants.' 56.1 Statement ¶ 47). Weng has also never asked Chief Dahlberg for permission to make a public statement regarding the Police Department. (Defendants' 56.1 Statement ¶ 48).

### 3. Brock Kain

Brock Kain has been employed by the Police Department since January 6, 1989. (Defendants' 56.1 Statement ¶ 51). Kain has been a union steward since early 2001 and was very vocal in opposition to the effort to decertify the union.. (Defendants' 56.1 Statement ¶ 54). Commander Scott criticized Kain for opposing decertification of the

union and tried to dissuade Kain from voting for the Teamsters." (Id.) Kain has received no letters of commendation since the union vote. ( Id.) Kain received a two day suspension without pay for getting a pizza while on duty at the Ravinia Festival, and lost 84 hours of overtime pay, whereas officer Coulter, who wrote an anti-union letter to the membership, received a 1 day suspension 2 months earlier, for not showing up for work at Ravinia at all. (Plaintiffs' 56.1 Response ¶ 54).

Kain ranked near the bottom on the 1991 exam. (Defendants 56.1 Statement ¶ 55). Kain never took another promotional exam after 1991. (Defendants' 56.1 Statement ¶ 56). Kain often joked about the answers to the Sergeants' examination being given out. (Defendants' 56.1 Statement ¶ 57). Many officers made similar jokes. (Id.)

Kain can recall two incidences of officers being disciplines for violating HPPD's media policy. One involved Rodney Watt who has filed his own federal lawsuit. The other person is Officer Rick Satchen where Officer Satchen set up his own website "hpnew.com." (Kain's 56.1 Response ¶ 63) Satchen was subsequently sent for a psychological evaluation by the HPPD. (Id.)

Kain admits that he too engaged in racial profiling while employed by the HPPD (Defendants' 56.1 Statement ¶ 60). Kain has spoken out twice about racial profiling in Highland Park. (Defendants' 56.1 Statement ¶ 64). On account of the November media policy now in effect Kain will "will not speak to the media." (Plaintiffs' 56.1 Response ¶ 65).

### 4. Martin Stumpf

Martin Stumpf is a patrolman with the HPPD. (Defendants 56.1 Statement ¶ 67). Stumpf had been employed by the HPPD since October 1988. (Id.). Stumpf has been

suspended without pay pending a Civil Service Commission hearing on his termination, arising from his conviction by a jury in the Lake County Circuit Court of criminal trespass to a motor vehicle, Case no. 01 CM 3939. (Defendants' 56.1 Statement ¶ 68). Stumpf is a member of Local 714 and was "one of the person actively supporting and organizing on behalf of the union. (Plaintiffs' 56.1 Response ¶ 69).

Stumpf took the Sergeant's examination in 1991. (Defendants; 56.1 Statement ¶ 71). He did not receive a passing score on th written exam. (Id.). He understands that a passing score is 70, and that the exam is not graded on a curve. (Id.) Stumpf did not take the Sergeant's exam in 1993. (Defendants' 56.1 Statement ¶ 72). Stumpf took the 1995 promotional exam and received a passing score on the written exam. (Defendants' 56.1 Statement ¶ 74). He has no knowledge of any alleged cheating on the 1995 exam. (Id.) Stumpf took the 2000 promotional exam (written exam on 12/15/99 and oral examination on February 5, 2000). (Defendants' 56.1 Statement ¶ 74). Stumpf ranked tenth on the 2000 Police Sergeant Final Eligibility List, with military points. (Defendants 56.1 Statement ¶ 74). The first five officers on the 2000 police Sergeants Final Eligibility List were promoted. (Id.). Stumpf claims that scores do not matter because they are predetermined by a Civil Service Commission, which promotes those candidates favored by Dahlberg and is determined as described by former assistant city manager Mayerhoffer. (Plaintiffs' 56.1 Statement ¶ 74).

Stumpf engaged in racial profiling in early 1989 but has not done so since then. (Plaintiffs' 56.1 Response ¶ 78). Stumpf signed a letter about racial profiling written to the Highland Park newspaper by Sgt. Larson and has spoken to several civilians in Highland Park about racial profiling. (Plaintiffs' 56.1 Response ¶ 82). Stumpf was

interviewed about racial profiling for the program Dateline and portions of the interview with Stumpf aired by Dateline. (Defendants' 56.1 Statement ¶ 83). Stumpf also spoke with Thomas Sullivan for Sullivan's report on the HPPD. (Id.).

## DISCUSSION

Summary Judgment is proper when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED. R.CIV. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmovant must show through specific evidence that a triable issue of fact remains on the issues on which he bears the burden of proof at trial. *See Celotex*, 477 U.S. at 324. "The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence." *Chemosource, Inc. v. Hub Group, Inc.*, 106 F.3d 1358, 1361 (7th Cir. 1997). A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Insolita v. Phillip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). We must evaluate the admissible evidence supporting the motion in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). It is with these standards in mind that we address the instant motion.

### DEFENDANTS' MOTION TO STRIKE

Defendants move to strike all of Plaintiffs' submissions contained in their Local Rule 56.1(b)(3)(A) statement for alleged non-compliance with the rule. Defendants claim Plaintiffs' additional facts have not been raised in response to Defendants' facts, many of

the additional facts are argumentative assertions and a number of Plaintiffs' exhibits lack evidentiary support, i.e. unauthenticated transcripts, the HPPD General Order 28, Tom Sullivan's March 20, 2000 letter etc. or are not relevant in time with respect to admissibility at trial. Because the Court does not rely on any of these documents in reaching its summary judgment decision the motion is moot. The fact some affidavits were prepared for another lawsuit does not make them inadmissable as long as they are relevant and authentic. Therefore, Defendants' motion to strike is denied.

## COUNT I-PLAINTIFFS' FIRST AMENDMENT CLAIMS

Defendants in moving for summary judgment on Count I argue that Plaintiffs are not entitled to damages for any of their alleged First Amendment violations. More specifically, Defendants argue the following: (1) Plaintiffs have no First Amendment right to publicly express their frustration at not being promoted; (2) Plaintiffs have no First Amendment claim based on their desire to speak about racial profiling because they have spoken out on racial profiling; (3) Plaintiffs' First Amendment rights were not infringed when the October Media Policy was in effect; (4) Plaintiffs have no standing to seek injunctive relief, and injunctive relief is inappropriate in this case; and (5) the allegations of Count I do not support any request for relief on the issues of alleged cheating within the department. The court addresses each argument in turn.

### I. PLAINTIFFS HAVE RAISED FACTS TO SUPPORT THEIR ALLEGATION THAT THEY ENGAGED IN PROTECTED SPEECH ON A MATTER OF PUBLIC CONCERN

In reviewing a § 1983 retaliation claims based on the First Amendment, a court must engage in a three step analysis. *Kuchenreuther v. City of Milwaukee,* 221 F. 3d 967,

12

973 (7th Cir. 2000)(quoting *Kokkinis v. Ivkovich,* 185 F. 3d 840, 843 (7th Cir. 1999)).

First, the court must determine whether the plaintiff's speech was constitutionally

protected. Next, the Court must apply the *Pickering* balancing test to "balance between

the interests of the [plaintiff], as a citizen, in commenting upon matters of public concern

and the efficiency and the interest of the State, as an employer, in promoting the

efficiency of the public services it performs through its employees." *Pickering v. Bd. of

Educ. of Township High Sch. Dist. 205,* 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d

811 (1968).    If the court determines that the speech in question merits First Amendment

protection, then the plaintiff moves on to the second part of his analysis, and must show

by a preponderance of the evidence that the constitutionally protected speech was a

motivating factor in the adverse employment decision. *Mt. Healthy City Sch. Dist. Bd. of

Educ. v. Doyle,* 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977).  Finally, if the

plaintiff can demonstrate that his constitutionally protected speech was a substantial or

motivating factor in the defendant's actions, the defendant is given the opportunity to

demonstrate that it would have taken the same action in the absence of the plaintiff's

exercise of his rights under the First Amendment. *Id.*

Defendants' first argument, Plaintiffs have no First Amendment right to publicly

express their frustration at not being promoted, is based upon *Durgins v. City of East St.

Louis,* 272 F.3d 841, 843 (7th Cir. 2001) ("[C]ommunications about personnel matters are

not covered by the First Amendment") and *Taylor v. Carmouche*, 214 F.3d 788, 791 (7th

Cir. 2000) (affirming grant of summary judgment when "[a]ll of the statements, protests,

and grievances were internal personnel matters, dealing with the situations of the

plaintiffs rather than matters of general public concern").  But this argument is, at best,

13

disingenuous.

The Supreme Court has made it clear that in order to proceed with a civil rights claims such as the one offered by the Plaintiffs here, the underlying statements that triggered the defendants' allegedly retaliatory action must have touched on a matter of "public concern." *Connick v. Myers,* 461 U.S. 138, 146, 103 S. Ct. 1684, 75 L. Ed.278 (1983). This is a question of law that the Court is to address. *Id.* at 470 n.10.

The applicable standard is that a "public employee's speech is constitutionally protected if it would be protected if uttered by a private citizen, it relates to a matter of public concern, and the public employer has not shown a convincing reason for forbidding the speech." *Hulbert v. Wilhelm,* 120 F.3d 648, 650 (7th Cir. 1997); *following Connick v. Myers,* 461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. 278 (1983). As the Supreme Court later noted, *Pickering* reflected "the common sense realization that government officers could not function if every employment decision became a constitutional matter." *Id.* at 143. A showing of public concern turns not on the general subject matter of the employee's speech, but on "the content, form, and context of a given statement, as revealed by the whole record." *Connick* at 147-48. Speech on matters of public concern has been defined as speech, relating to any matter or political, social or other concern to the community. *Khuans v. School Dist. 110,* 123 F. 3d 1010, 1014-15 (7th Cir. 1997). In applying the public concern prong of the *Connick* analysis, courts have held that where an employee acts to bring public attention to wrongdoing or illegality in their departments, their speech is of public concern and merits First Amendment protection from unhappy employers. *See Myers v. Hasara,* 226 F. 3d 821, 826 (7th Cir. 2000).

14

## A. Public Concern

Defendants argue that the matters on which these four Plaintiffs may have wished to speak out were merely internal personnel matters which were of no concern to the public. The record makes clear that various policies of the HPPD became the focus of intense public attention in the middle and late 1990s. The issues involved included racial profiling, the use of excessive force, falsification of police records, preferential treatment of politically well-connected citizens, discriminatory employment policies, union-busting, and serious irregularities in the promotional examination process. This public attention indeed prompted significant media interest in the HPPD and according to Plaintiffs have provided apparent motivation for the alleged violation of plaintiffs' First Amendment rights.

As the Supreme Court has noted, speech on public issues is "the essence of self-government' and "occupies the highest rung of the hierarchy of First Amendment values." *Connick v. Myers,* 461 U.S. 138, 145, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). Official misconduct is "a topic of inherent concern to the community. *See Khuans,* 123 F. 3d at 1016 and *O'Connor v. Steeves,* 994 F. 2d 905, 915 (1st Cir. 1993). In light of the nature of the statements the Court hereby finds that the statements made by Plaintiffs regarding union activity, alleged exam cheating and racism within the HPPD could be concluded to be a matter of public concern.

In *NLRB v. Virginia Elec. & Power Co.,* 314 U.S. 469, 477-78, 62 S. Ct. 344, 348-49, 86 L. Ed. 398 (1941) the Supreme Court concluded that an employer's attempts to persuade employees with respect to joining or not joining a union was protected by the First Amendment. While some union activities constitute protected speech and/or

15

conduct, "[i]t does not follow...that all activities of a union or its members are constitutionally protected." *Hanover Twp. Fed. of Teachers Local 1954 (AFL-CIO) v. Hanover Comm. Sch. Corp.*, 457 F. 2d 456, 460 (7th Cir. 1972). Paragraph 1 alleges discrimination against patrol officers who are members of the union. Paragraph 3 alleges that none of the Plaintiffs have had a fair chance at promotion because Plaintiff were members of the union or wanted to speak out against police wrongdoing. In particular, Pomozal alleges his name was on a list of union backers and that special circumstances i.e. the ability not to keep his dog, were manufactured to keep him from being promoted. Weng was a union steward and it is undisputed he promoted the initial unionization effort. Weng claims that he has had overtime pay taken away from him in retaliation for his union activity and Kain claims that he has received no commendations since the union vote. Viewed in context of this motion for summary judgment Plaintiffs have raised genuine issues of fact as to whether they were speaking out on a matter of public concern with respect to union and racial profiling issues. However, the record does not contain evidence that Plaintiffs ever spoke out on the issue of the promotional exams.

### B. Pickering Balancing Test

The second prong, known as *Pickering* balancing, *see Pickering v. Bd. Of Educ. of Township High School Dist. 205,* 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968) requires analysis of several factors including 1) whether the speech would create problems in maintaining discipline or harmony among co-workers; 2) whether the employment relationship is one in which personal loyalty and confidence are necessary; 3) whether the speech impeded the employee's ability to perform his or her responsibilities; 4) the time, place, and manner of the speech; 5) the context in which the

16

underlying dispute arose; 6) whether the matter was one which was vital to informed decision making; and 7) whether the speaker should be regarded as a member of the general public. *Kokkinis v. Ivkovich,* 185 F. 3d 840, 845 (7th Cir. 1999). Additionally, law enforcement agencies, as para-military organizations, are qualitatively different from other governmental branches; law enforcement employers are "subject to greater First Amendment restraints than most other citizens. *Kelley v. Johnson,* 425 U.S. 238, 96 S. Ct. 1440, 47 L. Ed. 2d 708 (1976) (the need for discipline and loyalty is especially important in law enforcement organizations).

Neither party has sufficiently addressed the application of this balancing test for purposes of this summary judgment motion. However, the thrust of Plaintiffs' constitutional claims are that they suffered retaliation at the hands of the Defendants for support of the union, for speaking out against racial profiling, use of excessive force, sexist and anti-semantic conduct, falsification of Police Department documents and exam fixing. If the Defendants deliberately lowered the Plaintiffs' exam scores because of their union activity or their voiced concerns about racism or other matters of public concern a constitutional violation could have occurred at that time for which relief may be appropriate. Defendants have set forth no arguments as to any alleged disruption, disharmony or discipline problems resulting from Plaintiffs' speech or any of the other balancing factors.

Moving on to the second prong of the *Pickering* analysis, a reasonable jury might conclude–drawing all inference in the Plaintiffs' favor–that the adverse employment actions by the Defendants all were substantially motivated by Plaintiffs' protected speech. Plaintiffs have offered material evidence which raises issues of fact as to whether

17

the speech engaged in by Plaintiffs was a motivating factor in the scoring of the promotional exams and in the discipline they received for various infractions.

If plaintiff meets this requirement, the burden shifts and defendant must show by a preponderance of the evidence that it would have taken the same actions even in the absence of the protected conduct. *Mt. Healthy,* 429 U.S. at 287. Defendants have failed to raise any facts to satisfy this third prong. Hence, giving the conflict in the evidence, Defendants' first argument is support of summary judgment must be denied.

## II. PLAINTIFFS HAVE ALLEGED SUFFICIENT FACTS TO SUPPORT A FIRST AMENDMENT VIOLATION EVEN THOUGH THEY HAVE SPOKEN OUT ON SOME OF THESE ISSUES

The second argument offered by Defendants is that because some of the Plaintiffs did indeed speak out publicly on some issues, there could have been no violation of Plaintiffs' First Amendment rights. This fact logically provides some support to Defendants' position that they have never tried to stifle Plaintiffs from publishing anything, the October Media Policy to the contrary. But it does not lead inevitably to such a conclusion. Whether or not the Plaintiffs actually ever spoke out, the constitutional violation would lie in the attempt to muzzle them, not in the ultimate success of the attempt to actually suppress public speech. But policies which have the effect of "chilling" speech through, for example, even minor forms of retaliation are sufficient to support a claim under the First Amendment. *Smith v. Fruin,* 28 F.3d 646, 649 n.3 (7th Cir. 1994).

The injury that plaintiffs say support these claims is the chilling effect Defendants' conduct has had on their freedom of speech and Plaintiffs have offered evidence to suggest that chilling occurred. Kain and Weng both complain of feeling

intimidated and not receiving commendations because of their union activities. (Plaintiffs' 56.1 Response ¶¶ 34, 51). Stumpf has spoken out on more than one occasion so his chill is not as apparent but it is undisputed he has never been promoted. In addition, the affidavits of other current HPPD employees Cheryl Bernardi and Monique Davis speak of being fearful of being retaliated against for speaking out on other issues. (Bernardi Aff. par. 14, Davis Aff. Par.7). James Coursey, another employee, in his affidavit states that he was told by Former Police Chief Bonamarte that "[y]ou'll will never go anywhere here, if you don't keep your mouth shut. (Coursey Aff. par. 4). Pierino DeRose states under oath "I did in fact sign the decertification petition relating to the union, because Chief Dahlberg said that everything will be fine, and that he (Chief Dahlberg) is going to take care of the officers. Sergeant Coffee told me that I would have a "long career here" if I did not sign the decertification petition. I did in fact sign the decertification petition, because I was afraid that Chief Dahlberg and the other structure would retaliate against me if I did not. (De Rose Aff. par. 10.).

Obviously, Plaintiffs had adduced sufficient evidence to substantiate its claim that Defendants' actions have deterred its members from exercising their First Amendment rights. Peter DeRose another Highland Park Police Officer testifies under oath that he was shown study materials used by fellow officer Coffee including copies of old exams and as a rule study materials were not given to candidates for the Sergeant's test. (Exhibit 6 to Plaintiffs' Response In Opposition to Summary Judgment). Officer DeRose testifies that bringing such matters to the attention of the command staff in the Highland Park Police Department was difficult, because the underlying message to Officers is that doing so will put their jobs in jeopardy, and the command staff has been, and is expected

19

by me to continue to intimidate him. (Id.) Officer Brock Kain testifies in his affidavit to being retaliated against after he voted for the union and being fearful of being retaliated against. (Exhibit 7 to Plaintiffs' Response In Opposition to Summary Judgment). Police Dispatcher Jason Kern testifies to being instructed to change the narratives and/or dispositions in the computer regarding gang activity. (Exhibit 9 to Plaintiffs' Response In Opposition to Summary Judgment). Jerold Larson, a Sergeant in the Patrol Division of the Highland Park Police Department states under oath that Chief Dahlberg reviewed a number of questions and answers on the Sergeant's exam with Larson prior to Larson taking the test. (Exhibit 11 to Plaintiffs' Response In Opposition to Summary Judgment).Former Assistant Highland Park Manager testified in his deposition [t]hey would –Well they would see a low written; they'd to give a high oral to get–if they wanted a ranking larger on the list. If they wanted somebody up on the list, they'd probably–he would verbalize that to the commission members. (Mayerhofer Dep. at pg. 157, lines 19-23)

The logic of Defendants' argument does not preclude, for example, the possibility that speech was stifled in response to reasonably anticipated retaliation, such as reassignment, lack of support for professional development, limited opportunities for overtime, and denial of promotion. There are ample facts in dispute concerning this alleged retaliation and, for purposes of this summary judgment motion, it is clear that a reasonable jury could find in Plaintiffs' favor. The fact that some Plaintiffs have spoken out on the alleged racial profiling does not in and of itself extinguish Plaintiffs' First Amendment claims.

### III. PLAINTIFF'S FIRST AMENDMENT COULD HAVE BEEN INFRINGED WHEN THE OCTOBER MEDIA POLICY WAS IN EFFECT

If Plaintiffs' allegations about the "long history" of Defendants' oppressive conduct are proven to be true, then the fact that none of the Plaintiffs have testified that they planned specifically to speak out during the duration of the October Media Policy and were restrained from doing so by that policy, as Defendants contend in their argument, is of little consequence. As such, it is clear that Plaintiffs have stated a claim for violation of their First Amendment rights despite the fact that some Plaintiffs have engaged in speech.

### IV. PLAINTIFFS HAVE ALLEGED ENOUGH FACTS TO ESTABLISH STANDING TO SEEK AN INJUNCTION

Defendants fourth argument puts forth that Plaintiffs have no standing to seek injunctive relief and that injunctive relief, in any event, would not be appropriate in this case. In order to have standing to seek such a injunction, a plaintiff must: (1) have suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) (internal quotations and citations omitted); (2) show that the injury is caused by the challenged activity; and (3) show that the injury is apt to be redressed by a remedy the court is prepared to give. *See id*, at 560-61, 112 S. Ct. 2130. Allegations of a "subjective chill [of First Amendment rights] are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.' *Laird v. Tatum*, 408 U.S. 1, 13-14, 92 S. Ct. 2318, 33 L. Ed. 2d 154 (1972).

This argument, which appears twice in Defendants' memorandum, seems to rely principally on the proposition that merely because Plaintiffs may have suffered some injury in the past, the bare fact of this injury would not, in itself, establish the real and immediate threat of future injury which would justify injunctive relief. This claim is correct as far as it goes. *See Tobin for Governor v. Illinois State Bd. of Elections*, 268 F.3d 517, 528 (7th Cir. 2001) *and Adarand v. Peña*, 515 U.S. 200, 210-11, 115 S. Ct. 2097, 132 L. Ed.2d 158 (1995). But such an argument obviously begs the question of whether Defendants' allegedly wrongful conduct is likely to recur, which is a determination to be made by the finder of fact. *Campbell v. McGruder*, 580 F.2d 521, 541 (D.C.Cir. 1978).

Hence, given the long history of violations alleged by the Plaintiffs, and the raft of evidence they have produced, the appropriateness of injunctive relief must be answered at or subsequent to trial. To be sure, Plaintiffs do not appear, however, to have standing to seek an injunction barring HPPD from treating then unequally in the future. Plaintiffs' standing to seek an injunction against future conduct cannot be premised on "[p]ast exposure to illegal conduct," *O'Shea v. Littleton,* 414 U.S. 488, 495, 94 S. Ct. 669, 38 L. Ed. 2d 674 (1974), or "hypothetical speculation and conjecture that harm will occur in the future," *Palmer v. City of Chicago,* 755 F. 2d 560, 571 (7th Cir. 1985). Rather, plaintiffs have such only if they can demonstrate that there is a real and immediate threat they will be denied equal treatment in the future under the November media policy or the promotional exam process. The grounds upon which Plaintiffs claim to be entitled to declaratory relief are also unclear but the appropriateness of this relief will determined later.

## V. THE ALLEGATIONS IN COUNT I ARE SUPPORTED BY SUFFICIENT DISPUTED FACTS TO SUPPORT PLAINTIFF'S FIRST AMENDMENT CLAIM THAT PLAINTIFFS WERE NOT GIVEN THE EXAM QUESTIONS AND ANSWERS BECAUSE THEY ENGAGED IN VARIOUS FORMS OF PROTECTED SPEECH.

As indicated by the affidavit of Jerold Larson the questions and answers on the Sergeant's exam were being given out to "favored" officers and those favored officers were not "union" officers. This testimony raises an issue of fact as to whether Plaintiffs were retaliated against for speaking out on union issues and/or racial profiling to support Plaintiff's allegations of wrongdoing on the exam.

## COUNT II PLAINTIFFS' EQUAL PROTECTION CLAIMS

To succeed on their equal protection claim, Plaintiffs must show that (1) [they] were "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment" or (2) "the government is treating unequally those individuals who are prima facie identical in all relevant respects, and that the cause of the differential treatment is a totally illegitimate animus toward the plaintiff by the defendant." *Nevel v. Village of Schaumburg,* 297 F. 3d 673, 681 (7th Cir. 2002). Defendants claim that "[t]here is no evidence that the plaintiffs suffered any denial of equal protection, irrational or otherwise, in the Highland Park Civil Service Commission's denial of their applications for promotion to sergeant." It is difficult to understand the reasoning behind this claim in view of the record. The testimony of former Assistant City Manager Mayerhoffer concerning the scoring on the promotional exams alone presents sufficient facts to warrant trial. In addition, we have an affidavit

from Sergeant Larson which indicates he received information as to the questions on the exam and we have deposition testimony from Plaintiff Brock Kain that he has received no letters of commendation since the union vote at the HPPD and an alleged unreasonable two day suspension for buying a pizza while on duty at Davinia. Officer Weng was allegedly threatened with the loss of overtime for his unionization efforts and Stumpf has taken the exam repeatedly. For other similar reasons, a jury could conclude that Defendants sought to deprive Plaintiffs of their rights under the equal protection clause because of their statements on certain public issues.

Defendants also claim, although only in passing and with little or no supporting argument, that Plaintiffs are not members of a protected class and hence implicitly are not entitled to bring an action under 1983. If this claim is based on an implicit argument that Defendants did not engage in "union-busting" activity to the detriment of Plaintiffs, we note that no answer is given to Plaintiffs' lengthy list of specific allegations of union-busting activity. The alleged unequal treatment on the exam coupled with the burden of having to litigate to vindicate their rights is sufficient injury to confer standing for those equal protections claims. *See Sherwin Manor Nursing Ctr. Inc. v. McAuliffe*, 37 F. 3d 1216, 1221-2 (7th Cir. 1994). Therefore, Defendants motion for summary judgment on Count II is denied.


## STATUTE OF LIMITATIONS

Defendants argue that Plaintiffs' claims for relief for wrongful denial of promotions should be barred by the applicable two-year statute of limitations for §1983 claims, in that Plaintiffs filed the original complaint in this action on November 28, 2000,

and all claims (except those of Plaintiff Stumpf) are premised upon acts or omissions that occurred prior to November 28, 1998 are therefore barred by the statute of limitations. In Illinois, the applicable limitations period for claims brought in federal court under 42 U.S.C. §1983 is Illinois's two-year statute of limitations for personal injury actions. *Smith v. City of Chicago Heights*, 951 F.2d 834, 836n1 (7th Cir. 1992). In the case now before the bench, the parties are agreed that only the last promotional examination taken by Officer Stumpf occurred within the statute of limitations.

But Plaintiffs argue that we should include the untimely promotion denials under the continuing violation theory, which allows a Plaintiff to seek relief for allegedly discriminatory acts that occurred outside the limitations period by linking them to acts within the period. *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992). Where discrimination has been alleged in employment policy, the plaintiff must demonstrate that "there has been a pattern or policy of discrimination continuing from outside the limitations period into the statutory limitations period, so that all discriminatory acts committed as part of this pattern or policy can be considered…timely." *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir. 1999).

In determining whether to apply the continuing violation doctrine, the Seventh Circuit considers three factors: 1) whether the alleged acts of discrimination involve the same subject matter; 2) the frequency at which they occurred; and 3) their degree of permanence, which should trigger an employee's awareness of and duty to assert his or her rights." *Selan*, 969 F.2d at 565. In the continuing violation theory most applicable to this case, the question is whether the defendant's acts were "related closely enough to constitute a continuing violation," or were "merely discrete, isolated and completed acts

which must be regarded as individual violations." *Id. quoting Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 981 (5th Cir. 1983); *see also Kielczynski v. Village of LaGrange*, 19 F.Supp.2d 877, 882 (1998).

The Seventh Circuit has expressly articulated the test for making this determination, as follows:

> What justifies treating a series of separate violations as a continuing violation? Only that it would have been unreasonable to require the plaintiff to sue separately on each one. In a setting of alleged discrimination, ordinarily this will be because the plaintiff had no reason to believe he was a victim of discrimination until a series of adverse actions established a visible pattern of discriminatory treatment.

*Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir. 1989); *Selan* 969 F.2d at 565-66.

In *a recent* opinion the Supreme Court discussed the continuing violation doctrine in employment discrimination cases. "A hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *National Railroad Passenger v. Morgan*, 536 U.S. 101, ???, 122 S. Ct. 2061, 2074 153 L. Ed. 2d 106 (2002). The Supreme Court concluded that as long as "any] act contributing to the claim occurs within the filing period, the entire time period of hostile work environment may be considered by a court for the purpose of determining liability." *Id.* The Supreme Court further explained that the situation is different for Title VII disparate treatment claims. Unlike hostile work environment claims, incidences of disparate treatment do not need to accumulate to be actionable. The Supreme Court clearly stated that discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges *Id.* at 2072. The Supreme Court noted that hostile work environment claims are different in kind from discrete

26

discrimination acts and that their very nature involves repeated conduct. *Id.* at 2074.

In this case, it is undisputed that Plaintiffs collectively took promotional examinations for the position of sergeant at least eight times from the late 1980s into the mid-1990s, and that Plaintiff Stumpf took the examination in 1999-2000. Plaintiffs allege that the examinations throughout this period were rigged so that examinees favored by Defendant Dahlberg and others would receive available promotions. Taking this allegation to be true for the purposes of this motion for summary judgment, the question here is at what point did the Plaintiffs have reason to believe that they were victims of discrimination. Plaintiff Pomazal's deposition makes abundantly clear that he had at least an inkling that something was wrong with the examination process as early as 1991 but claims that he only became aware of what was actually happening when he saw the Sullivan report, apparently in 2000. Plaintiff Kain's deposition indicates that he also apparently formed his belief in regard to discrimination in the promotion process partly as a result of reading the Sullivan report. Plaintiff Stumpf believed as early as 1993 that his taking the promotional examination would be an "exercise in futility" because "it appeared that the Chief got whoever he wanted to be a sergeant." Plaintiff Weng's deposition makes clear that " he understood in 1991 and 1993 that the official promotional examination process was at best tangential to the issue of who would be chosen for promotion."

Once again interpreting the admissible evidence in the light most favorable to the nonmoving parties, we find that the plaintiffs' have at a minimum offered evidence to raise an issue of fact of when the statute of limitations began to run. Plaintiffs argue that the overall pattern of alleged discrimination in the promotional process became clear to

them-such that they might reasonably be expected to assert their rights through a lawsuit-only with the publication of the Sullivan Report. This is directly indicated by uncontroverted statements in the depositions of Pomozal and Kain. All four plaintiffs have made clear that they believed long before the Sullivan Report that there was some degree of favoritism and unfairness corrupting the promotional process. But although specific acts of favoritism and unfairness may be constituent parts or aspects of a pattern of retaliation, they do not necessarily in and of themselves, constitute discrimination. We hold, therefore, that genuine issues of fact have been raised as to when the statute of limitations started to run for purposes of Plaintiffs' alleged unequal treatment.

## LACHES

Even if a plaintiff's claims fall within the applicable statute of limitations, Defendants may nevertheless raise the equitable defense of *laches*, which bars a plaintiff from maintaining a suit if the plaintiff unreasonably delays in filing the suit and thereby causes harm to the defendant. The laches defense "requires proof of 1) lack of diligence by the party against whom the defense is asserted, and 2) prejudice to the party asserting the defense." *AMTRAK v. Morgan*, 122 S.Ct. 2061, 2077 (2002), *quoting Kansas v. Colorado*, 514 U.S. 673, 687 (1995) *and Costello v. United States*, 365 U.S. 265, 282 (1961). In this case, beyond the bald assertion of the laches defense, Defendants have not pointed to any evidence demonstrating their implied claim that they have been prejudiced by the timing of Plaintiffs' action. We hold, therefore, that Plaintiffs' action is not barred by laches.[1]

---

[1]Defendants have also raised the argument of unclean hands which we decline to address at this stage of the litigation. This argument is relevant to credibility of the Plaintiffs and is not

## MUNICIPAL LIABILITY & CONSPIRACY

Defendants' final argument alleges that there is no credible evidence to support a finding of municipal liability. Relying on *Billings v. Madison Metropolitan Sch. Dist.* 259 F. 3d 807, 817 (7th Cir. 2001) Defendants' claim the City may not be held liable under a theory of vicarious liability.

Under *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611(1978), municipalities may be held liable under § 1983 for deprivations of federal rights. *Respondeat superior* will not suffice to impose § 1983 liability on the municipality. *Id.* Rather, "it is when the execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. Courts have identified three instances in which a municipality can be said to have violated the civil rights of a person because of this policy:

> (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*Baxter by Baxter v. Vigo County Sch. Corp.,* 26 F. 3d 728, 734 (7th Cir. 1994).

Defendants claim Plaintiffs rely on the last two theories to support their alleged *Monell* claim. This is not entirely true. Count I of Plaintiffs' complaint alleges that the October Media Policy was in fact an express policy which caused a constitutional

---

upon which summary judgment could be granted.

violation. Moreover, Plaintiffs have sufficiently raised facts to support their *Monell* claim in that it appears that pro-union officers and/or officers who spoke out on alleged racial profiling were customarily retaliated against in exam and job performance issues.

In addition, Defendants point out that the City's Civil Service Commission is the final policymaker for purposes of promoting police officers and that Plaintiffs have failed to present competent evidence that any members of the City's Civil Service Commission were aware of any wrongdoing within the HPPD. In light of this lack of evidence Defendants argue that the City itself cannot be held liable. The City will or will not be held liable in this case based on the alleged widespread practice by the HPPD of giving out answers and questions to the Sergeant's exam to favored police officers who do not support the union and/or opposed alleged racial profiling. Ultimately, if liability is established it will lie primarily with the City of Highland Park.

As to the conspiracy claim we agree with Defendants that no evidence has been produced as to an alleged conspiracy under section 1983. To plead a civil conspiracy, a plaintiff must allege an agreement on the part of the defendants to deprive him of his rights and an actual deprivation of those rights. *See Vukadinovich v. Zentz,* 995 F. 2d 750, 756 (7th Cir. 1993). In *Ryan v. Mary Immaculate Queen Center,* 188 F. 3d 857, 859-70 (7th Cir. 1999), Judge Posner stated that bare allegations of a conspiracy cannot survive a motion to dismiss and added that in order to allege a conspiracy, a plaintiff needs to describe the "form and scope" of the conspiracy, such as the terms of the agreements constitution the conspiracy, when these agreements were formed, and what the participants' role were. *Id.* At this summary judgment stage Plaintiffs still only make conclusory allegations of a conspiracy and fail to plead any detail whatsoever. There are

no facts alleged as to any individual defendants' involvement other than Dahlberg's alleging that a Defendant possessed knowledge of a constitutional deprivation without alleging more as to the Defendant's personal involvement in this deprivation is insufficient to hold the Defendant liable under section 1983. *Crowder v. Lash,* 687 F. 2d 996, 1006 (7th Cir. 1982). Because Plaintiffs have offered no evidence other than Dahlberg's alleged action summary judgment on Plaintiff's conspiracy theory is granted as to Defendants Pierce, Limardi, Barron, Brusslan, Greenbuam and Kamin.

The fact that Former City Manager Gary Mayerhoffer testified that Defendant Dahlberg and others "would decide who they wanted and ...then back into the numbers..." is insufficient as this stage of the litigation to support a conspiracy theory. Therefore, summary judgment is granted as to any conspiracy theory offered by Plaintiffs against the individual defendants.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (#91-1) is granted in part and denied in part and Defendants' motion to strike granted in part and denied in part (#104-1). The parties final pre-trial order is to be filed in open court on Thursday, March 24, 2003 at 2:00. Trial is set to commence on April 7, 2003 at 10:00 a.m.

**SO ORDERED**                    **ENTERED:** *3-7-03*

**RONALD A. GUZMAN**
**UNITED STATES JUDGE**

31